UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| THOMAS AUTHIER, | § | No. 5:14-CV-993-DAE |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| AUTOMATED LOGIC | § | |
| CONSULTING SERVICES, INC., | § | |
| | § | |
| Defendant. | § | |

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

Before the Court are two motions: (1) a Motion for Summary

Judgment filed by Automated Logic Consulting Services, Inc. ("Defendant" or

"ALCS") (Dkt. # 23); and (2) a Motion to Strike Inadmissible Summary Judgment

Evidence filed by ALCS (Dkt. # 33).  Pursuant to Local Rule CV-7(h), the Court

finds this matter suitable for disposition without a hearing.  After careful

consideration of the memoranda filed in support of and in opposition to the

motions, as well as the arguments presented at the hearing, the Court, for the

reasons that follow, (1) **DENIES AS MOOT** Defendant's Motion to Strike

Inadmissible Summary Judgment Evidence (Dkt. # 33); and (2) **GRANTS**

Defendant's Motion for Summary Judgment (Dkt. # 23).

1

BACKGROUND

This is a defamation and breach of contract case arising out of ALCS's termination of Plaintiff's employment.  It, however, does not challenge his actual termination.

ALCS is a company that provides technology for building automation; it offers services that range from heating and cooling systems, utility metering, to facility automation.  ("Hamilton Decl.," Dkt. # 23-1, Ex. A ¶ 3.)  ALCS maintains branches throughout the United States, including one in San Antonio, Texas, to offer these services.  (Id.)  In March 2012, ALCS hired Plaintiff as the general manager of its San Antonio branch office.  ("Authier Dep.," Dkt. # 23-3, Ex. C at 26:10−26:16.)

The San Antonio branch consists of two primary business groups: a service group dedicated to repairing previously sold automation systems, and a construction group that completes new installations.  (Hamilton Decl. ¶ 4; Authier Dep. at 30:10−30:15.)  To accomplish these two business functions, the San Antonio branch maintained an assortment of parts and equipment as inventory within its on-site warehouse.  When the service group repaired a previously sold system, it would remove a part from the inventory, use that part to repair the system, and directly charge the price to the customer.  (Authier Dep. at 31:13−31:15.)  However, when the construction group worked on new

2

installations, the required parts did not come from the warehouse inventory, but

instead were ordered, charged to the customer, and directly shipped to the

construction site.  (Id. at 31:5−31:22; "Choate Decl.," Dkt. 23-4, Ex. D ¶ 4.)

Often, parts for specific projects went unused and were sent back to the warehouse.

(Authier Dep. at 31:16−32:2; Hamilton Decl. ¶ 4; Choate Decl. ¶ 4.)  ALCS

categorized these unused parts as "excess parts."  (Hamilton Decl. ¶ 4; Authier

Dep. at 31:16−32:2.)  While the excess parts were not technically inventory, ALCS

viewed the excess parts as company property that had to be accounted for during

yearly and quarterly audits.[1]  (Hamilton Decl. ¶ 4; Choate Decl. ¶ 4; Authier Dep.

at 43:3−43:15.)

---

[1] Plaintiff attempts to create a genuine issue of material fact over whether excess parts should have been counted during audits.  ("Authier Aff.," Dkt. # 30-1 at 2.) For example, Plaintiff offers the following inadmissible hearsay statements: "I had been told by the company that Sarbanes Oxley did not permit the company to double count parts or to report parts as being in the company's inventory when the title to the parts was in the customer," and "he indicated to me that when he was the owner of the branch in Pittsburgh, they did not account for excess parts as a part of the inventory process."  (Authier Aff. at 2.)  The Court finds that such statements are inadmissible hearsay, and thus fail to create a genuine fact issue at summary judgment.  Snapt Inc. v. Ellipse Commc'n Inc., 430 F. App'x 346, 352 (5th Cir. 2011) (citing Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987)).  Nevertheless, even if such statements were admissible as an opposing party statement, the statements would produce a dispute of a non-relevant fact because the Court finds any alleged defamatory statement about Authier's conduct relating to the counting of excess parts was protected by a qualified privilege.

As branch manager, Plaintiff was required to sign a quarterly and annual Sarbanes-Oxley Certification ("SOX Certification").  (Authier Dep. at 32:3−32:20.)  ALCS's SOX Certification provided, inter alia, that,

> Per policy, an annual wall to wall physical inventory has been completed and the results of that review, and any related financial record adjustments have been appropriately reviewed, approved and retained.  In addition, <u>inventory has been assessed for excess or obsolete materials</u> at least annually and the results of that review and any adjustments, have been appropriately reviewed, approved and retained in accordance with company policy.

("SOX Certification," Dkt. 24-1, Ex. B-2 at 3.) (emphasis added).  ALCS also had a Code of Ethics that bound its employees to certain standards conduct.[2]  ("Code of Ethics," Dkt. # 30-10, Ex. I at 16.)  Standard of Conduct Number Five covered accuracy of records and stated,

> All assets, liabilities, revenues, expenses, and business transactions must be completely and accurately recorded on UTC's books and records, in accordance with applicable law, accepted accounting principles, and established UTC financial policies and procedures [. . .]  No secret or unrecorded cash funds or other assets will be established or maintained for any purpose.

(Id. at 8.)  "Failure to comply with this Code or any of its requirements will result in appropriate discipline, up to and including discharge."  (Id. at 16.)

---

[2] ALCS's Code of Conduct was published by its parent company, United Technologies Corporation ("UTC").  The two companies share a Code of Ethics. (Hamilton Decl. ¶ 15.)

4

On September 27, 2013, ALCS planned to conduct a "pre-audit" of the San Antonio branch.[3]  (Authier Dep. at 44:1−44:5; Hamilton Decl. ¶ 5.)  ALCS employee Joanne Choate was scheduled to observe the inventory count and ensure it was done correctly.  (Choate Decl. ¶ 5.)  The day before the "pre-audit," Kirk Hamilton, ALCS's Regional General Manager and Plaintiff's supervisor, received an anonymous phone call from an ALCS San Antonio branch employee who stated that Mike Ohlenburger, the San Antonio branch Operations Manager, had hidden excess parts in locked boxes in the parking lot.  (Hamilton Decl. ¶¶ 2, 6; Authier Dep. 47:25−48:5.)  Hamilton called Plaintiff to inform him about the allegation made against Ohlenburger.  (Hamilton Decl. ¶ 7; Authier Dep. 47:1−48:21.)  Hamilton asked Plaintiff to look into the allegation and states that he "specifically instructed [Plaintiff] to apprise the auditor, Choate, about the parts before she conducted the pre-audit the following day."  (Hamilton Decl. ¶ 7.)  Authier admits that he "told Hamilton that [he] would let Choate and Hamilton know what [he] had discovered about the parts."  (Authier Aff. at 3.)  After getting off the phone with Plaintiff, Hamilton states that he called Choate to inform her about the allegation about hidden parts in the parking lot, and if Plaintiff did not tell her about the parts, she was to ask about the allegedly hidden parts during the pre-audit.  (Hamilton Decl. ¶ 8.)

---

[3] Plaintiff explained that a "pre-audit" was a typical and preliminary audit used to prepare the branch for the official audit.  (Authier Dep. at 46:2−46:5.)

After getting off the phone with Hamilton, Plaintiff immediately called Ohlenburger to investigate the allegation.  (Authier Dep. at 49:9−49:17.)  Ohlenburger admitted that he placed excess parts in the boxes, but that in doing so, he was not hiding those parts because the excess parts were not technically inventory.  ("Ohlenburger Dep.," at 12:1−13:25.)  After speaking with Ohlenburger, Plaintiff sent an e-mail to Choate and courtesy-copied Hamilton.  ("Authier E-Mail," Dkt. # 23-2, Ex. B-3.)  In that e-mail, Plaintiff did not inform Choate and Hamilton, as he had agreed to, about the results of his investigation into the excess parts allegedly hidden by Ohlenburger.  (Id.)  Indeed, Plaintiff's email to Choate made no reference to allegedly hidden excess parts in locked boxes located in the parking lot.  Instead, Plaintiff wrote he wanted to discuss an issue pertaining to excess parts and whether excess parts should be added to inventory and disclosed during the audit.  (Id.)  Specifically, Plaintiff wrote "[w]hen you get a chance we need to discuss if a disclosure is warranted, or we should change a process, or just throw the excess [parts] away."  (Id.)

On September 27, 2013, Choate observed the pre-audit.  (Choate Decl. ¶ 8.)  Neither Plaintiff nor Ohlenburger were present.[4]  Instead, a project

---

[4] Plaintiff was on a one-day vacation (Authier Dep. at 44:6−44:16) and Ohlenburger was in the Rio Grande Valley conducting an ethics class (Ohlenburger Dep. at 10:1−10:6.)

coordinator at the San Antonio branch assisted Choate.  (Id.)  The project

coordinator did not inform Choate about the parts in the boxes, so Choate

requested to see their contents.[5]  (Id.)  Choate states that if she had not asked about

the locked boxes, the pre-audit would not have counted those excess parts which

would have resulted in a violation of company policy; the SOX Certification

unequivocally establishes that an audit is a "wall to wall physical inventory [ . . .

that] has been assessed for excess or obsolete materials."  (Choate Decl. ¶ 10; SOX

Certification.)

    Subsequently, ALCS conducted an investigation into why the San

Antonio branch placed excess parts in the parking lot and why no one at the branch

informed Choate prior to or during the pre-audit count.  (Hamilton Decl. ¶ 10.)

Gregg Riffle, the Regional Business Practices Officer, conducted the investigation.

("Riffle Decl.," Dkt. # 23-5, Ex. E ¶ 3.)  Riffle conducted various interviews with

San Antonio branch employees, including Plaintiff and Ohlenburger.  Based on the

interviews and his investigation, Riffle made the following findings: (1) Plaintiff

promised Hamilton that he would notify Choate of the parts in the locked boxes;

---

[5] The parties dispute whether the excess parts contained in the boxes had financial
value.  Choate, the Regional Finance Manager, attests that the parts were worth
"thousands of dollars" (Choate Decl. ¶ 9), while Authier attests that the parts had
no financial value (Authier Aff. at 4.)  The Court finds that this dispute is
immaterial because the relevant issue is whether Authier violated the Code of
Ethics by not telling the auditor about the allegedly hidden pieces; the disputed
value of the excess parts is immaterial to that determination.

(2) Plaintiff failed to notify Choate about the parts in the boxes; and (3) a conflict between Plaintiff's interview and Ohlenburger's interview about whether Plaintiff was aware of the excess parts.  (Id. ¶ 6.)  Riffle concluded that Plaintiff acted unethically and recommended to the Discipline Review Committee ("DRC") that ALCS terminate Plaintiff's employment.  (Id. ¶¶ 5,6.)  Riffle presented his findings to all three levels of the DRC; each level of the DRC reviewed Riffle's findings and recommended that ALCS terminate Plaintiff's employment.[6]  (Hamilton Decl. ¶ 11; Riffle Decl. ¶ 7.)

On November 12, 2016, Hamilton traveled to San Antonio to terminate Plaintiff based on the recommendation of the DRC.  (Hamilton Decl. ¶ 12.)  After firing Plaintiff, Hamilton and Natasha Hill, a human resources officer with ALCS, held a meeting with employees of the San Antonio branch in the warehouse.  ("Alberthal Dep.," at 11:11−11:17; Hamilton Decl. ¶ 13.)  One employee at the meeting gave deposition testimony that either Hill or Hamilton, or both, made the statement that Plaintiff was terminated for ethical violations.  (Id. at 14:6−14:14.)  However, another employee gave deposition testimony indicating that nothing was said about Plaintiff's alleged ethical violations.  ("Nicholson Dep.," Dkt. # 30-6, Ex. F. at 12:7−12:9.)

---

[6] The DRC also recommended that ALCS terminate Ohlenburger and another employee who Riffle discovered had removed thirteen company-owned cabinets from the San Antonio branch.  (Riffle Decl. ¶ 5.)

On November 10, 2014, Plaintiff filed the instant lawsuit against

ALCS.  (Dkt. # 1.)  On December 16, 2014, Plaintiff filed his First Amended

Complaint asserting causes of action for defamation and breach of contract;

Plaintiff also seeks a declaratory judgment that he did not violate any ethics rules

or company policies.  (Dkt. # 8 ¶ 12.)  On April 8, 2016, ALCS filed the instant

Motion for Summary Judgment.  (Dkt. # 23.)  Plaintiff filed Response (Dkt. # 30)

and ALCS filed a Reply (Dkt. # 32.)  On June 10, 2016, ALCS filed a Motion to

Strike various portions of Plaintiff's affidavit filed in support of his Response.

(Dkt. # 33.)  Plaintiff filed a Response to the Motion to Strike (Dkt. # 35) and

ALCS filed a Reply (Dkt. # 36).

## LEGAL STANDARD

A court must grant summary judgment when "the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Meadaa v. K.A.P.

Enterprises, L.L.C., 756 F.3d 875, 880 (5th Cir. 2014).  "Substantive law will

identify which facts are material."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248 (1986).  A dispute is only genuine "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party."  Id.

In seeking summary judgment, the moving party bears the initial

burden of demonstrating the absence of a genuine issue of material fact.  Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party meets this burden, the nonmoving party must come forward with specific facts that establish the existence of a genuine issue for trial.  Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc., 738 F.3d 703, 706 (5th Cir. 2013) (quoting Allen v. Rapides Parish Sch. Bd., 204 F.3d 619, 621 (5th Cir. 2000)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  Hillman v. Loga, 697 F.3d 299, 302 (5th Cir. 2012).

In deciding whether a fact issue has been created, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  Kevin M. Ehringer Enters. v. McData Servs. Corp., 646 F.3d 321, 326 (5th Cir. 2011) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).  However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment."  United States v. Renda Marine, Inc., 667 F.3d 651, 655 (5th Cir. 2012) (quoting Brown v. City of Hous., 337 F.3d 539, 541 (5th Cir. 2003)).

## DISCUSSION

I.     Whether ALCS Defamed Plaintiff

Defamation can take two forms: (1) statements made orally that constitute slander, or (2) statements made in writing that constitute slander.  No

matter the form, in order to succeed on a defamation claim, a plaintiff must prove:

(1) the publication of a false statement of a fact to a third party, (2) that was

defamatory concerning the plaintiff, (3) with the requisite degree of fault, and

(4) damages, in some cases.  In re Lipsky, 460 S.W.3d 579, 593 (Tex. 2015).  The

status of the person allegedly defamed determines the requisite degree of fault.  A

private individual, like Plaintiff, need only prove negligence.  Id.

A qualified privilege exists to what would otherwise be a defamatory

statement when the person making the statement makes it in good faith on a

subject matter in which the speaker has a common interest with the other person, or

with reference to which the speaker has a duty to communicate to the other.  See

TRT Dev. Co-KC v. Meyers, 15 S.W.3d 281, 286 (Tex. App. 2001); Dixon v.

Southwestern Bell Tel. Co., 607 S.W.2d 240, 242 (Tex. 1980).  In the business

context, the privilege applies if the statements being communicated are between

individuals "interested in the trade and commercial standing of another at the time

the information is given."  Mitre v. La Plaza Mall, 857 S.W.2d 752, 754 (Tex.

App. 1993).  The privilege does not apply if the statement was made with actual

malice or if the information was shared with others not sharing a common interest.

Randall's Food Markets, Inc.v. Johnson, 891 S.W.2d 640, 646 (Tex. 1995).

Communications between company leaders and employees concerning the

termination of another employee have been held to be protected by qualified

privilege.  Id. at 646−47; Bergman v. Oshman's Sporting Goods, Inc., 594 S.W.2d

814, 816 (Tex. Civ. App. 1980); Stephens v. Delhi Gas Pipeline Corp., 924 S.W.2d

765, 770 (Tex. App. 1996).  The question of whether a conditional or qualified

privilege exists is a question of law to be decided by the trial court.  TRT Dev. Co-

KC, 15 S.W.3d at 286.

To invoke the qualified privilege on summary judgment, the

defendant-employer must conclusively show that the statement was made without

actual malice.  Welch, 978 S.W.2d at 224.  "Actual malice does not include ill will,

spite, or evil motive, but it is the making of a statement with knowledge that it is

false or with reckless disregard of whether it is true."  Id. (citing Hagler v. Proctor

& Gamble Mfg. Co., 884 S.W.2d 771, 772 (Tex. 1994)).  Reckless disregard is a

high degree of awareness that the statement is probably false and evidence must

show that the defendant entertained serious doubts about the validity of the

statement.  Carr v. Brasher, 776 S.W.2d 567, 571 (Tex. 1989) (citing St. Amant v.

Thompson, 390 U.S. 727, 731 (1968)).

For the reasons that follow, the Court finds that ALCS is immune

from suit for defamation because of the qualified privilege.  The Court finds that

any alleged statement that Plaintiff was terminated for an ethical violation was

made in good faith because it was based on the independent recommendation of all

three levels of the DRC.  (Hamilton Decl. ¶ 11.)  Indeed, reliance on the DRC's

recommendation to terminate Plaintiff for violation of company policy

demonstrates that both Hamilton and Hill did not act with reckless disregard to the

truth—they were relying upon findings and recommendations by the discipline

committees.  Further, the alleged statement was made by ALCS leadership to only

employees of the San Antonio branch at a meeting in the warehouse.[7]  (Id. ¶ 13.)

Texas courts recognize that an employer's statements to a plaintiff's co-employees

are qualifiedly privileged because the employer and the co-employees have a

common interest in the operation of the business.  Bergman, 594 S.W.2d 814 at

816; Clifton v. Warnaco, Inc., 53 F.3d 1280 (5th Cir. 1995).  Indeed, the

undisputed evidence establishes that the meeting was part of ALCS's

communication plan to explain the terminations at the San Antonio branch (Hill

Dep. at 47:16−47:24; Hamilton Decl. ¶ 13), and to reinforce the company's

commitment to ethics and ethical operations (Hamilton Decl.¶ 13).  Accordingly,

---

[7] Plaintiff attempts to pierce the privilege by arguing that ALCS cannot prove that non-employees were not present at the meeting.  Such an argument misstates the burden shifting at summary judgment.  ALCS has come forward with evidence that the alleged statement was made to only ALCS employees.  (See Hamilton Decl. ¶ 13.)  To survive summary judgment, Plaintiff has a burden to proffer evidence contradicting this fact to create a genuine dispute of material fact.  He has failed to do so.  Plaintiff has offered no evidence that a non-employee was present at the meeting.  Instead, Plaintiff relies on Natasha Hill's testimony that she can't say for certain whether only employees were present.  Such testimony does not create a genuine dispute that a non-employee was present who heard the alleged publication.

the Court finds that the alleged statement that ALCS terminated Plaintiff for ethical violations is protected by a qualified privilege.

Plaintiff attempts overcome the qualified privilege by arguing that Riffle, the investigator, had actual malice towards Plaintiff during the investigation and that the Court should impute Riffle's actual malice to ALCS.  Specifically, Plaintiff asserts that Riffle was angry with Plaintiff for donating a company-owned trophy of an exotic deer to a charity.  (Authier Aff. at 5.)  However, "[a]ctual malice does not include ill will, spite, or evil motive."  Welch, 978 S.W.2d at 224. Therefore, any attempt by Plaintiff to introduce evidence that Riffle acted with ill will, spite, or evil motive is irrelevant.  Indeed, Plaintiff concedes this point in his Response by stating "Riffle's personal vendetta against Authier is not dispositive on the issue of actual malice."  (Dkt. # 30 at 13.)

This argument further fails for a variety of reasons.  First, Riffle is not alleged to have made any defamatory statement.  Second, any alleged defamatory statement about why ALCS terminated Plaintiff was not made based on Riffle's alleged actual malice, but based on three recommendations by the independent DRCs.[8]  Third, Plaintiff's only evidence to support the allegation that Riffle

---

[8] Plaintiff attempts to attack the independence of the DRCs by stating "I had observed that Riffle was very forceful in his demeanor and never failed to get the [DRC] to accept and adopt his recommendations."  (Authier Aff. at 6.)  However, Plaintiff proffers no evidence that Riffle forced the DRC to adopt his investigatory

Case 5:14-cv-00993-DAE   Document 38   Filed 07/28/16   Page 15 of 24

knowingly made false findings in his investigation is hearsay.[9]  Finally, Plaintiff's

attempt to use the cat's paw theory of liability is unavailing.  "Under this theory, a

plaintiff must establish that the person with a retaliatory motive somehow

influenced the decisionmaker to take the retaliatory action."  Zamora v. City of

Houston, 798 F.3d 326, 331 (5th Cir. 2015).  This theory is used in the

employment context in wrongful termination and retaliation cases.  Id.  It is not

apparent whether the cat's paw theory is applicable in the defamation context.

Nevertheless, even assuming that Riffle had actual malice towards Plaintiff, the

independent review and recommendation by the DRC broke any causal link

between Riffle and the alleged defamatory statement made at the company

meeting.  Further, there is no evidence that Riffle directly caused Hamilton or Hill

to make an allegedly slanderous statement about Plaintiff at the warehouse meeting

following his termination.

---

findings in this case.  Accordingly, any sworn statement about Riffle's alleged
powers of persuasion are irrelevant.

[9] Plaintiff states in his affidavit that "Riffle . . . indicated to me, falsely, that
Ohlenburger was contradicting my account of the events."  (Authier Aff. at 6.)
This is both hearsay and hearsay within hearsay as it purports to explain what
(1) Riffle said to Plaintiff and (2) what Riffle told Plaintiff about what Ohlenburger
said to Riffle.  Both are out of court statements offered for the truth of the matter
asserted—namely, that Riffle made false statements while interviewing Plaintiff
and allegedly knew Plaintiff had not violated company policy.  Even if this
statement was admissible as an opposing party statement under Federal Rule of
Evidence 801(d)(2)(D), it would be evidence of an irrelevant fact because ill will,
spite, or evil motive cannot form the basis of actual malice under Texas law to
pierce a qualified privilege for defamation.

15

Accordingly, the Court finds that summary judgment in favor of ALCS is proper because the alleged defamatory statement made at the meeting was protected by the qualified privilege.

II.    Breach of Contract Claims

A. Payment of Bonus

Plaintiff argues that ALCS has breached an incentive compensation agreement by terminating his employment and not paying him a bonus.  (Dkt. # 8 ¶ 11.)  The parties agree that Plaintiff's bonus eligibility is governed by the Branch Leadership Incentive Plan ("BLIP").[10]  (Dkt. # 23 at 21; Dkt. # 30 at 17.)

Under Texas law, courts enforce an unambiguous written contract according to its own terms.  U.S. Fire Ins. Co. v. Confederate Air Force, 16 F.3d 88, 91 (5th Cir. 1994) (citing Upshaw v. Trinity Companies, 842 S.W.2d 631 (Tex. 1992)).  In interpreting a written contract, "[t]he court's primary concern is to enforce the parties' intent as contractually expressed, and an unambiguous contract will be enforced as written." Interstate Contracting Corp. v. City of Dallas, 407 F.3d 708, 712 (5th Cir. 2005).  An ambiguity in a contract is a question of law which "arises only after the application of established rules of construction leaves

---

[10] Neither party challenges the validity of the BLIP as an actual contract, nor has either party submitted fully executed copies of the BLIP with proof of consideration.  Since neither party disputes the validity of the BLIP as a contract, the Court will assume that the parties have entered into a contract under the terms of the BLIP.

an agreement susceptible to more than one [reasonable] meaning." <u>DeWitt Cty.</u>

<u>Elec. Coop., Inc. v. Parks</u>, 1 S.W.3d 96, 100 (Tex. 1999).

    In this case, the BLIP provided for an annual bonus to be paid

quarterly. ("BLIP," Dkt. # 23-2, Ex. B-7.)  The quarterly bonus was generally

calculated based on quarterly progress towards the full year targeted projection.

(<u>Id.</u>)  However, the BLIP contained a forfeiture provision that states:

> [A]n Eligible Plan Participant whose employment is terminated for
> any reason, whether voluntarily or involuntarily, during the Plan Year
> or prior to receiving an incentive award, will automatically and
> immediately upon termination forfeit any eligibility under the Plan
> and any right to receive the incentive award, except where state law
> explicitly provides for payment.

(BLIP.)  This contract provision is unambiguous.  The BLIP expressly states that

Plaintiff forfeits his eligibility and right to receive any incentive award upon

termination "for any reason."  This unambiguous provision clearly shows the

parties' intent as contractually expressed.  Accordingly, Plaintiff's breach of

contract claim fails as a matter of law because the contract expressly states he is

owed no incentive due to his termination.  <u>See</u> <u>Wilson v. Noble Drillings Servs.,</u>

<u>Inc.,</u> 405 F. App'x 909, 915 (5th Cir. 2010) (holding that, under Texas law, a

company did not owe a bonus to a terminated employee where the incentive plan

stated that the employee must be actively employed on the date of payment to

remain eligible); <u>Skelton v. Mobile Sys. Intern. Inc.,</u> No. Civ. A 3:98-CV-1254M,

2000 WL 381945, at *7−8 (N.D. Tex. Apr. 14, 2000) (applying Texas law and

concluding that a bonus forfeiture provision is valid and prevents a plaintiff from

collecting a post-termination bonus); Burkard v. ASCO Co., 779 S.W.2d 805, 806

(Tex. 1989) (upholding the awarding of a post-termination bonus because the

contract did not condition receipt of the bonus on continued employment); SAS

Institute, Inc. v. Breitenfeld, 167 S.W.3d 840, 841 (Tex. 2005) (looking to the

express terms of the contract to determine whether an employee had to re-pay a

bonus).

Plaintiff, relying on two Texas cases, argues that he is entitled to

receive at least a pro rata share of the bonus payment due to him three days after

his termination.  (Dkt. # 30 at 17 (citing Miller v. Riata Cadillac Co., 517 S.W.2d

773, 775 (Tex. 1974); Handy Andy, Inc. v. Rademaker, 666 S.W.2d 300, 304 (Tex.

App. 1984).)  Miller stands for the proposition that "an employee who is

discharged without good cause prior to the time specified for payment of a bonus is

entitled to recover a pro rata part of such bonus for the period he actually worked."

517 S.W.2d at 775.  In Miller, the terminated employee had a valid oral contract

that the employer would pay him a bonus of 2.5% of net profits as part of his

compensation package.  Id. at 774.  Both Miller and Handy Andy are

distinguishable from this case because there was no issue that those plaintiffs were

contractually entitled to receive a non-discretionary bonus—the bonus was

included in the original employment contract and was not discretionary.  Here, as

explained above, pursuant to the express terms of the BLIP, Plaintiff forfeited his right to a bonus upon termination for any reason, so Plaintiff has no contractual right to a bonus.  See Lewis v. Vitol, S.A., 2006 WL 1767138, at *3 (Tex. App. 2006) (holding that Miller and Handy Andy only apply when a contract entitles a plaintiff to a bonus). Further, the bonuses in Miller and Handy Andy were non-discretionary, and here, the express language of the BLIP indicates that the incentive payment was discretionary.  For example, the BLIP states that "[t]his plan is a statement of the company's intent but is not . . . [an] assurance of compensation," but rather is "designed to reward the participant based on [performance]."  (BLIP.)

Nevertheless, the Court need not reach the question whether the BLIP entitles Plaintiff to a pro rata share of an incentive payment.  Assuming that the Plaintiff is entitled to a pro rata share, ALCS has proffered undisputed evidence that Plaintiff's pro rata share is $0.

Under the BLIP's terms, a branch manager received incentive payments based on a complex calculation that essentially measured branch and regional performance against a projected end-of-year target.  (See BLIP.) Incentive payments were paid in advance on a quarterly basis as a percentage of progress towards the annual target.  (Id.)  Since incentive payments were paid by quarter, situations arose where a branch manager could be overpaid in the early

19

fiscal quarters, and thus receive no incentive payments in later quarters due to overpayment or reduced performance.  Specifically, the BLIP provides that "[i]n the event of an overpayment resulting from the quarterly advance payment cycle . . . the amount of overpayment will be deducted from the subsequent incentive payment[s] . . . and reduce any earned incentive until the overpayment amount has been satisfied."  (Id.)

In this case, ALCS has submitted evidence showing that Plaintiff received a first quarter incentive payment of $30,219 and a second quarter incentive payment worth $19,537, for a total of $49,756 paid towards his annual total.  (Dkt. # 24-2, Ex. B-10.)  However, ALCS's financial statement shows that branch performance declined during the third quarter.  (Id.)  Due to reduced third quarter branch performance, Plaintiff's year-to-date annual projected bonus totaled $31,553, which meant Plaintiff had been overpaid in the first two quarters by $18,203.  Therefore, any incentive payment due to Plaintiff under the BLIP for the third quarter would be $0 because of the previous over-payments.

"Although the court must resolve all factual inferences in favor of the non-movant, the non-movant cannot manufacturer a disputed material fact where none exists.  Thus, a non-movant cannot defeat a motion summary judgment by submitting an affidavit which directly contradicts, without explanation, his previous testimony."  Albertson v. T.J. Stevenson & Co., 749 F.2d 223, 228 (5th

Cir. 1984); see Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999)

(collecting cases in which, "with virtual unanimity," the circuit courts have held

that a party cannot create a genuine issue of material fact sufficient to summary

judgment by simply later submitting an affidavit that contradicts the party's earlier

sworn deposition); S.W.S Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 495 (5th Cir.

1996) ("It is well settled that this court does not allow a party to defeat a motion

for summary judgment using an affidavit that impeaches, without explanation,

sworn testimony.")

        Here, Plaintiff gave sworn deposition testimony that he was "not one

hundred percent sure about whether the region had achieved [targeted

performance] or not.  Those numbers were kept by Joanne, I mean, we talked about

approximate[s] periodically, but I don't recall how the region was doing."

(Authier Dep. at 145:12−145:17.)  However, in his affidavit, Plaintiff states that

"my Incentive Compensation of $50,000 was to be paid under the company's

Incentive Compensation Plan . . . I kept track of the numbers of the branch

financials daily."  (Authier Aff. at 7.)  While Plaintiff may have had personal

knowledge of his branch's performance, his sworn testimony indicates that he does

not recall how the region performed as a whole.  Under the BLIP, Plaintiff's bonus

was calculated as a percentage of his branch performance and a percentage of the

region's performance.  (BLIP at 1.)  Since Plaintiff gave sworn testimony that he

doesn't recall the region's performance, he may not create a genuine issue about how much money ALCS owed him by baldly stating he was owed $50,000 because he kept track of branch performance only.  To create a genuine dispute that he was owed more than $0, Plaintiff would also have to show some evidence about the region's performance, but he has failed to do so.

Accordingly, even if the BLIP authorized Plaintiff a post-termination incentive payment, which it does not, that amount would be $0.

B. <u>Claim for Unused Vacation</u>

ALCS also moves for summary judgment on Plaintiff's breach of contract claim for unused vacation days.  (Dkt. # 23 at 24.)  However, a plain reading of Plaintiff's Complaint indicates that he has brought no such claim. Instead, Plaintiff's breach of contract claim expressly states only that "[p]laintiff had an agreement to be paid by his incentive compensation and was fired three days before it was due, to prevent him from getting it."  (Dkt. # 8 ¶ 11.)  Indeed, Plaintiff ignores addressing this argument in his Response.  Accordingly, the motion for summary judgment on Plaintiff's claim for unused vacation is moot.[11]

---

[11] It appears ALCS moved for summary judgment on this ground because Plaintiff gave deposition testimony that he was seeking a vacation payout.  (Authier Dep. at 86:10−86:12.)  However, stating a claim during a deposition is not legally sufficient; pursuant to Federal Rule of Civil Procedure Rule 8, claims must be stated in pleadings.

22

III.   Declaratory Judgment

Plaintiff "seeks a declaration from this Court that he did not commit any ethics violations or violate company policies in his handling of the circumstances that led to his dismissal by Defendant."  (Dkt. # 8 ¶ 12.)

The Federal Declaratory Judgment Act is "an enabling act, which confers discretion on the courts rather than an absolute right on the litigant." Sherwin-Williams Co. v. Holmes Cnty., 343 F.3d 383, 389 (5th Cir. 2003) (quoting Wilton v. Seven Falls Co., 515 U.S. 277, 287 (1995)).  As an enabling act, "the operation of the Declaratory Judgment Act is procedural only."  Lowe v. Ingalls Shipbuilding, A Div. of Litton Sys., Inc., 723 F.2d 1173, 1179 (5th Cir. 1984) (quoting Skelly Oil Co. v. Phillips Petrol. Co., 339 U.S. 667, 671 (1960)). The Supreme Court has explained, "the Declaratory Judgment Act is not an independent source of federal jurisdiction; the availability of such relief presupposes the existence of a judicially remediable right."  Schilling v. Rogers, 363 U.S. 666, 677 (1960).

When considering a declaratory judgment action, a district court must engage in a three-step inquiry: (1) whether the declaratory action is justiciable; (2) whether the court has authority to grant declaratory relief; and (3) whether to exercise its discretion to decide or dismiss the action.  Orix Credit Alliance, Inc. v. Wolfe, 212 F.3d 891, 895 (5th Cir. 2000).  Accordingly, to invoke relief under the

Federal Declaratory Judgment Act a plaintiff must have an underlying and viable cause of action.  See Reid v. Aransas Cnty., 805 F. Supp. 2d 322, 339 (S.D. Tex. 2011) (holding that a plaintiff cannot use the Federal Declaratory Judgment Act upon failure to state the existence of a judicially remediable right).  Here, Plaintiff has no remaining underlying and viable claim; the Court has granted summary judgment in favor of ALCS on each of Plaintiff's claims.  Since no remaining claim exists, there is no justiciable issue before the Court.  Indeed, Plaintiff has cited no other federal statute or cause of action that would make the declaratory action justiciable.  Accordingly, declaratory judgment is not proper.

<u>CONCLUSION</u>

For the reasons stated, the Court **GRANTS** Defendant's Motion for Summary Judgment (Dkt. # 23).  The Courts **ORDERS** Defendant's Motion to Strike **MOOT**.  (Dkt. # 33.)  The Court **ORDERS** this case **DISMISSED WITH PREJUDICE**. The hearing scheduled for August 11, 2016, is **CANCELED**.

**IT IS SO ORDERED.**

**DATE:** San Antonio, Texas, July 28, 2016.

_____

DAVID ALAN EZRA
UNITED STATES DISTRICT JUDGE

24